IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CORNELIUS BROWN, | ) | 8:14CV298 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| LORI STRONG and | ) | |
| DIANNA MASTNY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on a motion for summary judgment filed by the defendants, Lori Strong and Dianna Mastny, and on a cross-motion for summary judgment filed by the pro se plaintiff, Cornelius Brown. Brown claims in his amended complaint that the defendants, who were employed as nurses at the Norfolk Regional Center where Brown was committed for inpatient sex offender treatment, retaliated against him for complaining to the State Ombudsman's Office and, in Strong's case, for filing this lawsuit. The retaliatory conduct allegedly consisted of Strong giving Brown negative checks for rule violations and Mastny giving Brown negative marks on his treatment program, suspending privileges, and forwarding negative comments to the mental health board.

For the reasons discussed below, the defendants' motion for summary judgment will be granted, Brown's cross-motion will be denied, and a final judgment will be entered dismissing the action.

## I. PRELIMINARY MATTERS

Before addressing the competing motions for summary judgments, several non-dispositive motions must first be resolved.

### A. Plaintiff's Motion to Compel Discovery (Filing No. 89)

After the defendants filed their motion for summary judgment on February 19, 2016, Brown filed a motion to compel discovery. The motion indicates a request for production of documents was served by Brown on November 11, 2015, and responded to by the defendants on January 29, 2016, but certain documents, including "Nursing Notes From December 20, 2014 to March 10, 2015," and "Plaintiff's requests via appointment requests Dated October 7, 2014 through October10, 2014," were not produced as requested. A copy of the defendants' response, without any attached documents, has been filed by Brown as part of his evidence in opposition to the defendants' motion for summary judgment (Filing No. 92-7). Also filed by Brown as an exhibit is a copy of a letter that was sent to Brown on February 17, 2016, from Assistant Attorney General Ryan C. Gilbride, advising that these documents would not be produced because they were beyond the scope of Brown's request (Filing No. 92-8). The court agrees with defense counsel's assessment, and will deny Brown's motion to compel. To the extent that Brown's motion might be construed as a motion filed pursuant to Federal Rule of Civil Procedure 56(d), it will also be denied because Brown has not shown by affidavit or declaration that without these documents he cannot present facts essential to justify his opposition to the defendants' motion for summary judgment.

### B. Defendants' Motion to Strike (Filing No. 93)

The defendants have moved to strike one paragraph each in four declarations of non-parties and two paragraphs of Brown's affidavit filed in opposition to the defendants' motion for summary judgment.[1] The motion will be granted because it has

---

[1] Exhibits 1, 2, 3, and 4 are declarations signed by four patients at the Norfolk Regional Center who state that they would "attest to the plaintiff being negatively scored on, or disciplined because of his civil complaint," and explain:

- Yes, Iv heard the plaintiffs [*sic*] state "this will and can effect your scoring" (Ex. 1 (Filing No. 92-1), ¶ 18).

not been shown that the non-party declarants or Brown have personal knowledge of the matters stated by them. *See* [Fed. R. Civ. P. 56(c)(4)](); [Fed. R. Evid. 602](). Brown's objection to the motion to strike (Filing No. [99]()) will be denied.

### *C. Plaintiff's Motion for Appointment of Counsel (Filing No. [100]())*

Brown has renewed his request for appointment of counsel. The court cannot routinely appoint counsel in civil cases. In *[Davis v. Scott, 94 F.3d 444, 447 (8th Cir. 1996),]()* the Eighth Circuit Court of Appeals explained that "[i]ndigent civil litigants do not have a constitutional or statutory right to appointed counsel." Trial courts have "broad discretion to decide whether both the plaintiff and the court will benefit from the appointment of counsel, taking into account the factual and legal complexity of the case, the presence or absence of conflicting testimony, and the plaintiff's ability to investigate the facts and present his claim." *[Id.]()* Having considered these factors, the renewed request for the appointment of counsel will be denied.

### *D. Plaintiff's Motion for Depositions (Filing No. [101]())*

In a filing captioned "Memorandum," the plaintiff asks the court to authorize funds for him to depose the defendants. Treated as a motion, this filing will be denied.

---

- Yes, [illegible] they say it will hurt your scored (Ex. 2 (Filing No. [92-2]()), ¶ 18).

- Yes, it has been unambiguously stated by defendants that plaintiff's and other legal actions whatever they may be, are treatment interferring behavior which will keep them in treatment (Ex. 3 (Filing No. [92-3]()), ¶ 18).

- Yes, I would attest to it because he was negatively scored by Lori Strong (Ex. 4 (Filing No. [92-4]()), ¶ 18).

Exhibit 13 is the plaintiff's declaration in which he states that (1) he "recieved negative scores, and baseline checks in retaliation for contacting the Ombudsman's office and negative comments were forwarded to mental health board by defendants," and (2) "Defendants Mastny and Strong are reporting false statements in their affidavit to this Court" (Ex. 13 (Filing No. [92-13]()), ¶¶ 9, 11).

The statutory right to proceed in forma pauperis does not include the right to receive funds from the court to pay discovery or other costs relating to a pro se litigant's case. 28 U.S.C. § 1915; *see also* *Haymes v. Smith*, 73 F.R.D. 572, 574 (W.D.N.Y. 1976) ("The generally recognized rule is that a court may not authorize the commitment of federal funds to underwrite the necessary expenditures of an indigent civil litigant's action.") (citing *Tyler v. Lark*, 472 F.2d 1077 (8th Cir. 1973), other citations omitted). To the extent that Brown's motion might be construed as a motion filed pursuant to Federal Rule of Civil Procedure 56(d), it will also be denied because Brown has not shown by affidavit or declaration that without these depositions he cannot present facts essential to justify his opposition to the defendants' motion for summary judgment.

### E. Defendant's (Second) Motion to Strike (Filing No. 104)

Finally, the defendants have moved to strike paragraphs 9 and 11 of Brown's affidavit submitted in support of his motion for summary judgment. This is the same affidavit that was filed in opposition to the defendants' motion for summary judgment. For the reasons stated above, the motion to strike will be granted.

### II. SUMMARY JUDGMENT MOTIONS

In a memorandum and order entered on September 29, 2015, the court dismissed all claims alleged in Brown's amended complaint except First Amendment retaliation claims alleged against Strong and Mastny in their individual capacities. Regarding the non-dismissed claims, the court stated:

> Brown alleged a § 1983 retaliation claim against Strong and Mastny. With respect to Strong, he alleged she began retaliating against him after she learned he had complained to the Ombudsman's Office and filed a civil action against her. He alleged she gave him negative marks that resulted in his inability to progress in his treatment. He also alleged Strong made the following statements: (1) "'I am being sued by Cornelius and that is why he's still Level 2,'" and (2) "'People want to

sue staff don't move forward.'" (Filing No. 37 at CM/ECF p. 6.) With respect to Mastny, Brown alleged she gave him negative scores on his treatment plan, placed him on privilege suspension, and forwarded negative comments about him to the mental health board after she learned he met with members of the Ombudsman's Office about racial discrimination at the NRC. (Filing No. 37 at CM/ECF pp. 7-8.)

To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) he engaged in protected activity; (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Revels v. Vincenz*, 382 F.3d 870 (2004) (citing *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002)). Further, "[t]o prevail in an action for First Amendment retaliation, [a plaintiff] must show a causal connection between [the defendant's] retaliatory animus and [the plaintiff's] subsequent injury." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (citing *Hartman v. Moore*, 547 U.S. 250 (2006)).

Brown's allegations of retaliation are plausible. They suggest Strong and Mastny reacted to Brown's complaints to the Ombudsman's Office and his filing of a civil lawsuit by taking steps to prevent him from advancing in his treatment program. Therefore, Brown's retaliation claims against Strong and Mastny in their individual capacities will not be dismissed at this time. The court notes here that Brown's claims for preliminary injunctive relief against Strong and Mastny are now moot in light of Brown's transfer to the Lincoln Regional Center.

(Filing No. 49 at CM/ECF pp. 7-8).

Because admissible evidence filed by the defendants in support of their motion for summary judgment disproves Brown's allegations and conclusively establishes that neither defendant engaged in any retaliatory conduct, the defendants' motion will be granted and all claims alleged against them will be dismissed with prejudice. Brown's cross-motion for summary judgment will be denied.

## A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, *Anderson*, 477 U.S. at 249. However, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

"A mere scintilla of evidence is insufficient to defeat summary judgment and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (internal quotation marks and citations omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the

objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012) (internal quotes and citations omitted).

"Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Santiago v. Blair*, 707 F.3d 984, 989 (8th Cir. 2013). Courts may address either prong of the analysis first, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and "the defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012).

### B. Undisputed Facts

Under the court's local rules, "[t]he moving party must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). "The statement of facts should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph." NECivR 56.1(a)(2) (underlining in original). "<u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response</u>." NECivR 56.1(b)(1) (underlining in original).

Upon careful review, the court finds that the following material facts, as stated in defendants' brief, are fully supported by the evidence cited and have not been controverted by the plaintiff with admissible evidence of his own. Consequently, they are deemed admitted for purposes of summary judgment. *See id.*; Fed. R. Civ. P. 56(e)(2).

1. The state hospital for the mentally ill established in Madison County, Nebraska is known as the Norfolk Regional Center (NRC). [Neb. Rev. Stat. § 83-305](#).

2. Brown was a patient at NRC from December 30, 2013 through September 9, 2015. (Ex. 1 (Filing No. [87-1](#)), ¶ 4; Ex. 2, ¶ 5)

3. Brown was committed to NRC for inpatient sex offender treatment by the Douglas County Mental Health Board (MHB) after being identified as a dangerous, untreated sex offender under LB1199. (Ex. 2 (Filing No. [87-2](#)), ¶ 14)

4. Strong is a Registered Nurse licensed to practice nursing in the State of Nebraska. (Ex. 1, ¶ 2)

5. Strong has been employed as a Nurse Manager at the NRC since December 20, 2010. (Ex. 1, ¶ 3)

6. Strong was not Brown's assigned nurse so she rarely interacted with him. (Ex. 1, ¶ 5)

7. Strong rarely talked to or administered medications for Brown. (Ex. 1, ¶ 6)

8. Strong did not participate in any of the scoring on Brown's treatment plan. (Ex. 1, ¶ 7)

9. Checks are given to NRC patients for violations of NRC rules and for failure to participate in their program requirements. Checks are noted in the weekly baseline sheet for NRC patients. The weekly baseline sheet is a document that lists the daily behavior requirements of NRC patients. It is a violation of NRC rules for an NRC patient to use profanity. An NRC patient can get a check for using profanity. (Ex. 1, ¶ 8)

10. Strong gave Brown approximately two checks in the entire time he was an NRC patient. (Ex. 1, ¶ 9)

11. Strong gave Brown a check for using profanity. (Ex. 1, ¶ 10)

12. Strong never gave Brown a check in retaliation for contacting the State Ombudsman's Office. (Ex. 1, ¶ 11)

13. Strong never gave Brown a check in retaliation for being sued by him. (Ex. 1, ¶ 12)

14. Strong did not give Brown enough checks to affect the progression of his treatment. (Ex. 1, ¶ 13)

15. Strong heard Brown walking around the unit muttering profanities. The profanities were sometimes loud enough for others to hear. Strong warned Brown not to use profanities. Strong did not give Brown a check every time she heard him mutter a profanity. (Ex. 1, ¶ 14)

16. Strong observed Brown passing soda pop with another patient at dinner. The action was a violation of NRC rules. Strong told the Treatment Team about this incident. The team reviewed the incident on video. The Treatment Team placed Brown on Privilege Suspension as a result of this incident. (Ex. 1, ¶ 15)

17. Brown was transferred from NRC to the Lincoln Regional Center (LRC) when his treatment progressed from a Level 2 to a Level 3. The progression of Brown's treatment was typical compared to other NRC patients. Brown was at Level 2 at NRC for 21 months. NRC patients typically take two years to progress from a Level 2 to a Level 3 in their treatment. (Ex. 1, ¶ 16)

18. Strong knew Brown contacted the State Ombudsman's Office. Strong did not know how many times Brown met with the members or when the meetings occurred. Strong did not know the specific reason for the meetings. Strong knew Brown had the right to meet with members of the State Ombudsman's Office. Strong knew many NRC patients contact the State Ombudsman's Office. Strong did not care whether Brown met with the State Ombudsman's Office. (Ex. 1, ¶ 17)

19. Strong does not remember when she learned Brown had sued her. (Ex. 1, ¶ 18)

20. Strong never said she was being sued by Brown and that was why he was still at Level 2. (Ex. 1, ¶ 19)

21. Strong never said people who want to sue staff don't move forward. (Ex. 1, ¶ 20)

22. Mastny is a Registered Nurse licensed to practice nursing in the State of Nebraska. (Ex. 2, ¶ 2)

23. Mastny was employed by the NRC as a Nurse Manager from approximately October 2010 until May 19, 2014. (Ex. 2, ¶ 3)

24. Mastny has been employed by NRC as a Unit Supervisor since May 19, 2014. (Ex. 2, ¶ 4)

25. Mastny was the Nurse Manager for Brown from approximately April 2014 to September 2014. (Ex. 2, ¶ 6)

26. Brown was assigned a different Nurse Manager from September 2014 until he was transferred to LRC on September 9, 2015. (Ex. 2, ¶ 7)

27. Mastny rarely interacted with Brown once she was no longer his Nurse Manager. (Ex. 2, ¶ 8)

28. Mastny did not give Brown "negative scores" on his treatment plan. One person alone is not responsible for treatment plan scoring. Several individuals participate in treatment plan scoring including therapists, facilitators, and nurses. The scores from each individual are totaled and averaged out. The level scoring system was set up this way to ensure no single person could unduly influence the level score of a patient. (Ex. 2, ¶ 9)

29. Mastny participated in Brown's treatment plan scoring in her capacity as his Nurse Manager. Brown's cumulative average treatment plan scoring continued to rise and he continued to advance in his treatment program during the time Mastny participated in his scoring, to wit: a) April 15, 2014 – 1.36 = Level 1; b) June 10, 2014 – 1.98 = Level

2; c) August 5, 2014 – 2.11 = Level 2; and d) September 29, 2014 – 2.24 = Level 2. (Ex. 2, ¶ 10)

30. Mastny did not place Brown on Privilege Suspension. Placing a person on Privilege Suspension requires a doctor's order after a decision/discussion by the Treatment Team. As a Registered Nurse, Mastny could not "put" someone on Privilege Suspension herself. Such action would be outside of the scope of her practice. Mastny's license did not allow her to write a doctor's order. (Ex. 2, ¶ 11)

31. A patient making a request to the Treatment Team is not a reason to be placed on Privilege Suspension. Privilege Suspension is designed to provide an opportunity for the patient to regain his focus on treatment. Privilege Suspension is often used when a patient is either escalating anti-therapeutic behaviors or his capacity to function in the program is seen as deteriorating. Privilege Suspension is usually reviewed approximately every 3 days on Monday and Thursday. These orders are reviewed by the Treatment Team. (Ex. 2, ¶ 12)

32. Brown was on Privilege Suspension three times during his treatment at NRC for the following reasons:

a) On July 30, 2014, Brown told another patient, "Why don't you shut me up?!" and exhibited a threatening stance in a stairwell after the patient allegedly told Brown to shut up. The Treatment Team determined the incident created a potentially dangerous situation. The Privilege Suspension was discontinued on July 31, 2014.

b) On August 29, 2014, Brown was observed passing and receiving soda pop with another patient. Passing and receiving soda pop is a NRC rule violation and prohibited practice. The incident was confirmed on video. The Privilege Suspension was discontinued on September 2, 2014.

c) On November 17, 2014, Brown made the statement: "I'm going to flip on out and go to jail!" to get moved off of 3 East living unit. Brown was upset after another patient was transferred to his unit to make room for an incoming admission on another

unit. The Treatment Team determined the incident was a threat to the safety of the unit. On November 18, 2014, Brown turned in his badge stating: "If there is a problem with me carrying this around, then you wear it!" and slapped the badge and lanyard down on a table in front of Mastny. The Treatment Team saw the incident as threatening behavior. On November 24, 2014, the Privilege Suspension was discontinued. (Ex. 2, ¶ 13)

33. The average time it takes to complete Phase I of inpatient sex offender treatment is 18-24 months. This varies by individual and their level of treatment engagement. Brown completed Phase I in approximately 21 months. (Ex. 2, ¶ 14)

34. A patient's treatment plan identifies strengths, behavioral definitions, objectives, goals, accomplishments and progress, and areas they still need to address. These plans are reviewed every two months for the first 12 months, then every three months thereafter. A patient may petition the MHB every six months and request a hearing to challenge his commitment. To the best of Mastny's knowledge, Brown did not request a hearing to challenge his commitment. These plans are developed by the Treatment Team, reviewed by Brown's facilitators and members of his Treatment Team, and signed before it is sent to the MHB. These plans also serve as a progress report to the MHB supporting their decision of commitment. (Ex. 2, ¶ 15)

35. Mastny did not forward "negative comments" regarding Brown to the MHB. No single person at NRC sends a progress note to the MHB regarding a patient without it being reviewed by the entire Treatment Team. Brown's progress notes were reviewed by his facilitators, providers, and classes. All members would review the plan, update or change objectives, and offer input, changes, and feedback prior to it being forwarded to the MHB. (Ex. 2, ¶ 16)

36. Mastny understood Brown was allowed to call the State Ombudsman's Office. Mastny understood calling the State Ombudsman's Office was Brown's right, and that the number for the State Ombudsman's Office was posted on the units. Mastny did not care whether Brown contacted the State Ombudsman's Office. (Ex. 2, ¶ 17)

37. Brown continued to make steady progress and completed Phase One at NRC at which time he was transferred to LRC where he continued his sex offender treatment. (Ex. 2, ¶ 18)

(Filing No. 86 at CM/ECF pp. 1-7).

The statement of facts in Brown's brief filed in support of his motion for summary judgment (Filing No. 97 at CM/ECF pp. 2-3) does not comply with the court's local rules by referencing evidentiary materials. Nonetheless, the court has reviewed all of the evidence and compared it to the facts stated. With respect to each of the 7 paragraphs of Brown's statement, which are set forth below, the court finds:

1. Plaintiff Cornelius Brown was civilly committed to the Norfolk Regional Center for sex-offender treatment on December 20, 2014.

(Filing No. 97, ¶ 1). This statement is not supported by the evidence. Plaintiff's affidavit states he was committed on December 19, 2013 (Filing No. 98, ¶ 2).

2. Six months after arriving at "NRC," Plaintiff had advanced to Level 2 in his inpatient treatment.

(Filing No. 97, ¶ 2). The defendants admit that Brown advanced to Level 2 in his inpatient treatment on June 25, 2014 (Filing No. 102 at CM/ECF p. 1).

3. Dianna Mastny became Unit Supervisor in May of 2014 and approx. 3 months later during a CLS group (8/22/14) both defendant(s) Mastny and Strong stated that short of a couple of patients all other patients on Unit 3-East were negative, to which time Plaintiff began requests to move.

(Filing No. 97, ¶ 3). The evidence does not directly support this statement. Brown merely states in his affidavit that "Plaintiff and other patients on Unit 3-East were told

by Defendants Mastny and Strong in CLS group that they were all negative (Filing No. 98, ¶ 7).[2]

> 4. In November of 2014, Plaintiff was subjected to being placed on priveledge suspension, for allegedly using threatening statement during his requests to be transferred to another unit. This occured after Plaintiff's visit with members of the Ombudsmans Office twice (7/29 & 9/9 = 2014), and following Plaintiff's filing of this Civil Action (9-30-14), to which Plaintiff admits to no threats being made.

(Filing No. 97, ¶ 4). Brown states in his affidavit that he made written complaints to the Ombudsman's Office on July 20 and September 9, 2014, and visited with members of the Ombudsman's Office on July 29, 2014. Brown does not deny in his affidavit that threats were made.

> 5. In their sworn statements to this Court, Defendant(s) Mastny and Strong, Answers (Plaintiff's Interrogatory Question No. #14) that they were unaware of Plaintiff's filing(s) of this action until after December 17, 2014. Plaintiff objects to this statement, and admits that Defendants Mastny and Strong were aware of Plaintiff's filing(s) as it was documented in Plaintiff's September 29, 2014 treatment plan update.

(Filing No. 97, ¶ 5). There is no evidence the defendants were aware of the filing of the lawsuit before being served on December 19, 2014 (Filing Nos. 27, 28).While the evidence shows Mastny was aware of the September 29, 2014 treatment plan update, she did not believe Brown had actually filed a lawsuit based on this information; in

---

[2] Strong denies making such a statement. (Ex. 1, ¶ 8) Mastny does not recall making such a statement. (Ex. 2, ¶ 7) Regardless, resolution of this factual dispute does not affect the outcome of the lawsuit. The fact that Strong and Mastny told Brown and other patients that they were "all negative", taken as true, does not constitute a material fact because it does not establish Brown was engaged in a protected activity under the First Amendment; nor does it establish retaliatory intent on the part of the defendants.

fact, the lawsuit was not actually filed until September 30, 2014 (Ex. 1, ¶ 13; Ex. 2, ¶11; Filing No. 1). Moreover, Brown does not allege in his amended complaint that Mastny retaliated against him for filing a lawsuit; he alleges that Strong retaliated for this reason, but she was not on the treatment team and did not read the treatment plan update (Filing No. 37, at CM/ECF pp. 7-8; Ex. 2, ¶¶ 11, 12).

> 6. In their sworn statements to this Court, Defendants Mastny and Strong alleges that both Defendants had very little to no interactions with Plaintiff and submitted before this Court that Strong only gave Plaintiff (2) negative checks during his confinement to NRC, when this Defendant had given him (7) checks, and Defendant Mastny gave Plaintiff (5) checks, and all of the checks were given in retaliation after the filing of this case and contradicts defendants claims.

(Filing No. 97, ¶ 6). There is no evidence to support the statement concerning the number of "negative checks" given or the legal conclusion that they were given in retaliation for the filing of this case.

> 7. Defendants in their sworn statements and allegations brought before this Court are frivolous, and inconsistent, as they continue to violate Plaintiff's constitutional rights by disregarding orders, and requests made on behalf of Plaintiff and this Court.

(Filing No. 97, ¶ 7). There is no evidence to support this conclusory argument.

### *C. Discussion*

To establish a First Amendment retaliation claim under § 1983, a plaintiff must show (1) he or she engaged in a protected activity, (2) the government official took adverse action against plaintiff that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). The retaliatory conduct itself need not be a constitutional violation; the

violation is acting in retaliation for the exercise of a constitutionally protected right. *Spencer v. Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013).

### 1. Brown's Claims Against Strong

In his amended complaint, Brown makes two First Amendment retaliation claims against Strong. Brown alleges Strong gave him negative marks in the form of checks in retaliation for his (1) complaining to the State Ombudsman's Office and (2) filing a lawsuit against her (Filing No. 37, at CM/ECF p. 6).

Strong does not dispute that complaining to the State Ombudsman's Office or filing a lawsuit constitute engagement in an activity protected under the First Amendment. It is well established that the right to file a legal action is protected under the First Amendment. *Spencer*, 738 F.3d at 911. The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out. *Peterson*, 754 F.3d at 602. Strong does dispute, however, that Brown can prove the other two essential elements of his claim.

The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003). The test is an objective one, not subjective. *Id.* at 729. The question is not whether the plaintiff was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done. *Id.* The question is what a person of ordinary firmness would have done. *Id.*

The alleged retaliatory acts herein are far too insignificant to have deterred a person of ordinary firmness from exercising their constitutional rights. The adverse actions at issue are approximately two checks Strong gave Brown (Ex. 1, ¶ 9). The evidence shows checks are notes NRC staff make in the weekly baseline sheet of NRC

patients who violate rules or fail to participate in program requirements (Ex. 1, ¶ 8). A few instances in which Strong noted Brown failed to follow an NRC rule or a treatment program requirement are insufficient to chill a person of ordinary firmness from continuing to speak out or file a lawsuit because there is no evidence Brown suffered any negative consequence as a result of receiving a check from Strong. The evidence shows the checks Strong gave Brown did not affect the progression of his treatment, and that he completed the NRC phase of his treatment within the typical timeframe of any NRC patient (Ex. 1, ¶¶ 13, 16). Consequently, the evidence fails to establish Strong took an adverse action against Brown that would have chilled a person of ordinary firmness from continuing protected activity.

Under the third prong of the First Amendment retaliation claim test, a plaintiff must show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action. *Peterson*, 754 F.3d at 602. In other words, a plaintiff must show he or she was singled out because of exercise of constitutional rights. *Id.* The causal connection between the adverse action and the protected activity is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

There is no evidence Strong was motivated to give Brown checks because he complained to the State Ombudsman's Office and sued her. The evidence shows Strong rarely interacted with Brown, and only gave him around two checks the entire time he was an NRC patient (Ex. 1, ¶¶ 6, 7, 9). Strong specifically recalls giving Brown one check for using profanity (Ex. 1, ¶¶ 8, 10). Strong never gave Brown a check for contacting the State Ombudsman's Office or for suing her (Ex. 1, ¶¶ 11, 12). In fact, Strong refrained from giving Brown checks when doing so would have been within her authority (Ex. 1, ¶¶ 8, 10, 14). Moreover, Strong knew Brown had the right to meet with members of the State Ombudsman's Office; did not care whether Brown met with the office; and did not even remember when she learned Brown had sued her (Ex. 1, ¶¶ 17, 18).

To survive summary judgment, Brown must present evidence of a causal connection between constitutionally protected activity and an adverse action. Brown simply presumes Strong retaliated against him on the basis of nothing more than conclusory statements. In his amended complaint, Brown alleges checks from Strong resulted in his treatment plan being scored in such a way as to prevent him from moving forward in his treatment (Filing No. 37, at CM/ECF p. 6). However, the evidence shows Strong did not give Brown enough checks to affect the progression of his treatment, and his treatment progression was typical compared to other NRC patients (Ex. 1, ¶¶ 13, 16).

There is nothing to show any action of Strong was at all motivated by Brown's engagement in an activity protected under the First Amendment. There is no evidence Strong treated Brown any differently than any other NRC patient due to his exercise of constitutional rights.

### 2. Brown's Claims Against Mastny

In his amended complaint, Brown makes three First Amendment retaliation claims against Mastny. Brown alleges after Mastny learned he met with members of the State Ombudsman's Office, she (1) gave him negative scores on his treatment plan, (2) placed him on Privilege Suspension, and (3) forwarded negative comments about him to the MHB (Filing No. 37, at CM/ECF pp. 7-8).

Mastny does not dispute that meeting with members of the State Ombudsman's Office constitutes engagement in a protected activity. Therefore, the questions to be decided are whether Mastny took adverse action against Brown that would chill a person of ordinary firmness from continuing in this activity, and whether the adverse action was motivated by the exercise of the activity.

The evidence shows Mastny was not solely responsible for scoring Brown's treatment plan (Ex. 2, ¶ 9). Brown's treatment plan was scored by several individuals,

and she only participated in the scoring when she was his Nurse Manager (Ex. 2, ¶¶ 9, 10). Moreover, Brown did not receive negative scores on his treatment plan during the time Mastny was involved with the scoring. The evidence shows Brown's cumulative treatment plan scores continually increased during this time (Ex. 2, ¶ 10). Brown progressed in his treatment within the average timeframe of any NRC patient, and fully completed the NRC phase of his treatment (Ex. 2, ¶¶ 14, 18).

Mastny did not have the authority to place Brown on Privilege Suspension herself (Ex. 2, ¶ 11). The evidence shows the Treatment Team placed Brown on Privilege Suspension for repeated threatening behavior towards NRC patients and staff as well as passing soda pop with another patient in violation of NRC rules (Ex. 2, ¶ 13).

The evidence also shows Mastny was not solely responsible for forwarding comments to the MHB; any comments about Brown that were forwarded to the MHB were reviewed and forwarded by all members of the Treatment Team (Ex. 2, ¶ 16). Treatment plans and other documentation forwarded to the MHB regarding Brown were not intended to be "negative" comments, but rather served as treatment progress reports supporting the MHB decision of commitment (Ex. 2, ¶ 15).

There is no evidence Mastny was motivated to take any action in retaliation for Brown meeting with members of the State Ombudsman's Office. In fact, Mastny knew Brown had the right to contact the State Ombudsman's Office; knew Brown could easily contact the office; and did not care whether Brown contacted the office (Ex. 2, ¶ 17).

To survive summary judgment, Brown must present evidence of a causal connection between constitutionally protected activity and an adverse action. Brown simply presumes Mastny retaliated against him on the basis of nothing more than conclusory statements. In his amended complaint, Brown alleges Mastny gave him negative scores on his treatment plan, placed him on Privilege Suspension, and

forwarded negative comments to the MHB (Filing No. 37, at CM/ECF pp. 7-8). However, Mastny did not have the sole authority to take any of these alleged adverse actions against Brown (Ex. 2, ¶¶ 9, 10, 11, 13, 16). The evidence shows Brown's cumulative treatment scores continually increased during Mastny's involvement; Brown was placed on Privilege Suspension for good cause; and Brown progressed in treatment within the average timeframe of any NRC patient (Ex. 1, ¶ 16; Ex. 2, ¶¶ 10, 13, 14).

There is nothing to show any action of Mastny was at all motivated by Brown's engagement in an activity protected under the First Amendment. There is no evidence Mastny treated Brown any differently than any other NRC patient due to his exercise of constitutional rights.

### III. CONCLUSION

Because Brown's evidence fails to create a genuine issue of material fact regarding the alleged deprivation of a constitutional right, the defendants are entitled to the entry of judgement in their favor as a matter of law. Accordingly,

IT IS ORDERED:

1. Defendants' motion for summary judgment (Filing No. 85) is granted, and Plaintiff's claims against them are dismissed with prejudice.

2. Plaintiff's motion to compel discovery (Filing No. 89) is denied.

3. Defendants' motion to strike (Filing No. 93) is granted, and these portions of Plaintiff's evidentiary materials are stricken:
   a. Paragraph 18 of Filing Nos. 92-1, 92-2, 92-3, and 92-4; and
   b. Paragraphs 9 and 11 of Filing No. 92-13.

4.    Plaintiff's motion for summary judgment (Filing No. 96) is denied.

5.    Plaintiff's objection to motion to strike (Filing No. 99) is denied.

6.    Plaintiff's motion to appoint counsel (Filing No. 100) is denied.

7.    Plaintiff's motion for depositions (Filing No. 101) is denied.

8.    Defendants' (second) motion to strike (Filing No. 104) is granted, and
      Paragraphs 9 and 11 of Filing No. 92-13 are stricken.

9.    Final judgment shall be entered by separate document.

DATED this 4th day of May, 2016.

                              BY THE COURT:

                              *Richard G. Kopf*
                              Senior United States District Judge